**Guy M. PATTERSON, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security Administration, Defendant.**

**No. 98–4103–RDR.**

United States District Court,
D. Kansas.

Aug. 31, 1999.

Roger D. Fincher, Bryan, Lykins & Hejtmanek, P.A., Topeka, KS, for Plaintiff.

Nancy Landis Caplinger, Office of United States Attorney, Topeka, KS, for Defendant.

### MEMORANDUM AND ORDER

ROGERS, District Judge.

This is an action to review a final decision by the Commissioner of Social Security regarding plaintiff's entitlement to disability insurance benefits and supplemental security income (SSI) benefits under the Social Security Act. The parties have briefed the relevant issues and the court is now prepared to rule.

### I.

Plaintiff filed an application for disability and SSI benefits on March 2, 1993. He alleged that his disability began on December 31, 1988. Plaintiff indicated that he was disabled due to memory loss, leg pain, headaches and trouble dealing with stress. Plaintiff's application was denied initially and on reconsideration by the Social Security Administration (SSA). Two hearings were ultimately conducted by an administrative law judge (ALJ) on plaintiff's application. On April 25, 1997, the ALJ determined in a written opinion that plaintiff was not entitled to disability or SSI benefits. On April 27, 1998, the Appeals Council of the SSA denied plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner.

### II.

This court reviews the Commissioner's decision to evaluate whether the records contain substantial evidence to support the findings, and to determine whether the correct legal standards were applied. *Castellano v. Secretary of Health*

& Human Services, 26 F.3d 1027, 1028 (10th Cir.1994). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Soliz v. Chater, 82 F.3d 373, 375 (10th Cir.1996) (quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). In reviewing the Commissioner's decision, the court cannot weigh the evidence or substitute our discretion for that of the Commissioner, but we have the duty to carefully consider the entire record and make our determination on the record as a whole. Dollar v. Bowen, 821 F.2d 530, 532 (10th Cir.1987).

The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled. Reyes v. Bowen, 845 F.2d 242, 243 (10th Cir. 1988). If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there. Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989). The burden of proof is on the claimant through step four; then it shifts to the Commissioner. Id.

### III.

Plaintiff was born on April 20, 1956. He completed the eleventh grade and later received a GED. He has previously worked in the construction business applying sheetrock. He also worked briefly in nursing homes as a nurse's aide in 1994 and 1995. He has not worked since that time.

Plaintiff was involved in an automobile accident on May 25, 1979. He was unconscious when he arrived at the hospital emergency room. His injuries included a severe closed head injury, a massively comminuted fracture of the left femur, and ligament damage to the right knee. He was finally discharged from the hospital on August 6, 1979. He was fully ambulatory with a cast. On February 18, 1980, plaintiff demonstrated excellent range of motion of the hip and knee on the left side.

There are no other medical records in the plaintiff's file until after he sought disability benefits in March 1993. These medical records were prepared as a result of plaintiff's application for disability benefits. On April 16, 1993, Linda A. Dunn, Ph.D., evaluated plaintiff. Plaintiff reported good physical health but said that he had trouble keeping a job because "[s]tress gets to me." Plaintiff indicated to Dr. Dunn that he spends time fixing up his house, fishing, playing basketball and riding a bicycle. Dr. Dunn, after finding that plaintiff had an IQ of 98, noted the following concerning his intellectual abilities:

Mr. Patterson is clearly able to understand and follow written and verbal instructions, and his intellectual functioning is in the average range. Although it is erratic, it does not appear that he has had deterioration from a previously higher level of intellectual functioning. His memory functioning does, however, show moderate impairment. Although Mr. Patterson did not admit to psychiatric symptoms, it does appear that he has characterological difficulties and may require more thorough projective testing to elucidate the particular nature of those difficulties.

On May 8, 1993, Henry Kanarek, M.D., examined plaintiff. Plaintiff described a thirteen-year history of low back pain and neck pain as well as bilateral knee and shoulder discomfort. He also indicated that he had frequent headaches. Plaintiff stated that he could sit for thirty minutes, stand for five hours, walk a mile and occasionally lift fifty pounds. Dr. Kanarek's examination revealed that plaintiff's joints were free of tenderness, erythema and effusion except for pain in both shoulders and knees as well as in his neck and back. He did find a normal range of motion in all joints. Dr. Kanarek noted that plaintiff had full use of his hands and that motor and sensory function remained intact. He found that plaintiff had $20/20$ uncorrected vision, bilaterally. He diagnosed plaintiff with traumatic arthralgias or joint pain,

but noted there was no evidence of radiculopathy.

Plaintiff was next seen by Rosemary E. Tuggle, a psychologist, on February 25, 1994. She noted that plaintiff reported feeling depressed and stated that he is not "dealing with things real easy." Plaintiff further indicated that his short-term memory was very poor. He noted that he had severe headaches that began after his accident and that he took a shot for these headaches. He was unable, however, to identify what the shot was, and he further indicated that he currently has no physician and takes no prescription medication. He denied any alcohol or drug use. Ms. Tuggle diagnosed plaintiff with dysthymia, alcohol abuse in remission, cannabis abuse in remission, and brain damage. She indicated that plaintiff's current Global Assessment of Functioning was 55, which indicated moderate symptoms. Ms. Tuggle referred plaintiff for a psychological evaluation to further clarify his need for treatment.

On May 20, 1994, plaintiff was evaluated by David Elsbury, a psychologist. Plaintiff was pleasant and cooperative, but his affect appeared bland. Mr. Elsbury noted that plaintiff did not return after the lunch break to finish his evaluation. He stated that plaintiff did not respond to numerous letters, and his telephone was disconnected. Testing showed that plaintiff's general memory, delayed memory and verbal memory were significantly impaired such that they would interfere with his daily and occupational functioning. On September 6, 1994, plaintiff returned for the second half of his evaluation. Mr. Elsbury concluded that the psychological tests were consistent with the profile of an individual whose life had been altered significantly by a serious injury. He opined that the overall results supported a diagnosis of dysthymia but did not evidence a severe mental illness.

Plaintiff was examined on two occasions by Sharon L. McKinney, D.O. Dr. McKinney first saw plaintiff on February 2, 1995.

At that time, he reported that he had been unconscious for two and one-half months after his accident. He further indicated that the accident caused a left hip fracture and his left eye was out of the socket. He noted that his eye had been fixed but that he had limited visual acuity in that eye. He told Dr. McKinney that he could not hold a job because he gets frustrated and stressed. Dr. McKinney found that upper and lower extremity range of motion was adequate. Plaintiff had normal strength and his lumbar range of motion was adequate. She noted that his memory was very poor and his efforts at problem solving were not good. Dr. McKinney provided the following evaluation:

I recommend neuropsych testing for this gentleman because I think he is significantly impaired cognitively speaking. He is pretty strong physically although the limp will make him liable for back problems. He should not do heavy lifting and will not be able to do nursing home work from a physical standpoint much longer. He should not be doing jobs that involve walking, standing, going up and down stairs, bending, stooping or handling heavy weight. He does not have the mental capacity for sedentary jobs at least as far as I can see.

Dr. McKinney saw plaintiff again on August 2, 1995 for an evaluation of his back pain. On examination, Dr. McKinney noted full range of motion in both upper extremities and good strength. He had adequate range of motion and strength in his neck. Dr. McKinney diagnosed plaintiff with fibromyalgia and ordered physical therapy.

On June 13, 1995, plaintiff was evaluated by Terrie L. Price, Ph.D. Plaintiff reported ongoing headaches and stated that his pain got so severe one or two times a year that he had to be hospitalized. He also reported memory problems since his accident as well as motor coordination difficulties such that he could not run. Dr. Price indicated that the neuropsychological test findings, in addition to historical and clinical test

observations, suggested an individual of average to above average native potential who has had changes in functional status as a result of his automobile accident. She diagnosed plaintiff with dementia secondary to closed head injury and noted that he would require assistance with job training and placement. Dr. Price opined that plaintiff would do better at a hands-on job with structure and supervision.

At the first hearing before the ALJ, plaintiff stated that he lived in a one-story house with his father. He stated that he had difficulty walking up and down stairs due to his knees giving out on him. He has suggested that he had difficulty sleeping, but he did not know the cause for this problem. He reported no difficulty pushing and pulling with his arms, but indicated that he has problems bending and stooping. He stated that he could lift forty pounds without discomfort or other problems, walk about one-half mile, stand about forty-five minutes, and sit a couple of hours. He indicated that he takes a couple of naps per day. He stated he no longer drinks beer and was not sure if he ever did drink. His activities consisted of watching television about an hour a day, listening to his father play guitar, fishing once every three weeks, and cutting wood to sell.

Glennis Patterson, plaintiff's wife, also testified at this hearing. She indicated that they were separated because "he got real stressed out with our finances and the kids and he was showing a quite a bit of depression." She reported that plaintiff accidentally set their pasture on fire and burned down her son's trailer. She testified that when her husband drinks, his personality changes and he gets an attitude. She also said that he becomes aggressive and gets out of control. Mrs. Patterson indicated that he has periodic blackouts if he is hurried or stressed. She stated, however, that if she writes a list of things for plaintiff to do, then most of it will get done.

At a supplemental hearing on January 13, 1997, plaintiff testified that he had not had a beer in a long time. He stated that he last worked in 1995 at a nursing home. He indicated that he has been cutting wood since 1992, and he usually does it one week a month. He reported he has been going to counseling for depression and it has helped.

Mrs. Patterson testified again and indicated that plaintiff had not consumed alcohol since they got back together in May. Before their separation, she had some questions as to whether he was drinking. She stated that plaintiff had trouble remembering to take care of his personal hygiene. She also noted again that he had blackouts where he shuts down for a while and does not remember anything.

Dr. Ronald Fredrickson, a vocational expert, testified in response to a hypothetical question which assumed plaintiff's age, education and work experience. The hypothetical also assumed the following limitations: (1) could not lift more than forty pounds; (2) could sit for two hours at a time; and (3) could stand for forty-five minutes at a time with no bending and stooping except to occasionally retrieve a dropped item. The hypothetical also contained the following limitations on the work activity: (1) low stress consistent with a full scale IQ of 94; (2) simple work with no more than three to four step processes; (3) mechanical/spatial type work that could be learned by watching and doing; (4) work that would not require flexibility in terms of changes in the job process; and (5) instructions for the work could be seen and performed rather than provided verbally. Dr. Fredrickson determined that such an individual could perform unskilled, sedentary work such as hardware assembler, production checker and coil inspector. He noted that such jobs exist in significant numbers in the state and national economies.

The ALJ determined that plaintiff did not have a severe impairment prior to

April 16, 1993. He further determined, giving plaintiff the benefit of the doubt, that he did have impairments that combined to constitute a severe impairment since April 16, 1993, although he did not suffer from a listed impairment. The ALJ found that the testimony of plaintiff and his wife concerning plaintiff's pain and functional limitations was not credible. He determined that plaintiff had the residual functional capacity to meet the demands of a limited range of medium work. Given plaintiff's exertional capabilities and limitations, along with his age, education, past relevant work and nonexertional limitations, the ALJ concluded, after considering the vocational expert's testimony, that plaintiff could perform work which exists in significant numbers in the local and national economies. Accordingly, the ALJ determined that plaintiff had not been disabled since December 31, 1988.

## IV.

■ Plaintiff contends that the ALJ's decision is not supported by substantial evidence. He argues that the evidence in the record supports his contention that he is disabled. He contends that the ALJ failed to consider certain evidence including: (1) his testimony concerning his poor memory, his inability to handle stress, and his physical problems with his knees, shoulders and hips; (2) his wife's testimony concerning plaintiff's inability to handle stress; and (3) Dr. McKinney's testimony concerning his physical and mental limitations. Plaintiff also argues that the hypothetical questions posed by the ALJ failed to consider all of his impairments that were supported by medical evidence.

Having carefully reviewed the record, the court finds that there is substantial evidence to support the ALJ's determination. In a thorough opinion, the ALJ meticulously examined the medical evidence in the record. The ALJ's decision was influenced by the following factors: (1) the fourteen-year gap in medical evidence between his accident and his application for disability benefits; (2) the lack of any medical treatment following 1980; (3) the lack of objective medical evidence to support some of plaintiff's complaints; and (4) the lack of credibility of plaintiff and his wife. The court agrees with the ALJ's assessment of these various factors.

The medical record does support the ALJ's conclusion that plaintiff does suffer from impairments but they are not disabling. The court is not persuaded that Dr. McKinney's statements suggest, as argued by plaintiff, that plaintiff is disabled. Dr. McKinney did not indicate that plaintiff was unable to perform any work activity. All of the doctors that examined plaintiff indicated that he had the ability to perform some work with certain limitations. The ALJ considered these limitations in determining that plaintiff retained the residual functional capacity to perform some jobs.

■ The court also finds that the ALJ properly evaluated the credibility of plaintiff and his wife. In evaluating the credibility of a claimant, an ALJ must consider and weigh a number of factors in combination. *See Huston v. Bowen,* 838 F.2d 1125, 1132 & n. 7 (10th Cir.1988). The court recognizes that the ALJ is " 'optimally positioned to observe and assess witness credibility.' " *Adams v. Chater,* 93 F.3d 712, 715 (10th Cir.1996) (quoting *Casias v. Secretary of Health and Human Services,* 933 F.2d 799, 801 (10th Cir.1991)). Therefore, the court may overturn such a credibility determination only when there is a conspicuous absence of credible evidence to support it. *See Trimiar v. Sullivan,* 966 F.2d 1326, 1329 (10th Cir.1992). The court finds that the ALJ's credibility determinations of plaintiff and his wife are properly linked to substantial evidence in the record. The record is replete with inconsistencies between the statements

made by the plaintiff and his wife and the medical evidence and record.

 Finally, plaintiff contends that the hypothetical questions posed to the vocational expert by the ALJ did not properly include all of his impairments. " '[T]estimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision.' " *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir.1991) (quoting *Ekeland v. Bowen*, 899 F.2d 719, 722 (8th Cir.1990)). However, in formulating a hypothetical question, the ALJ need rely only on those impairments supported by substantial evidence in the record. *See Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir.1990). The court's review of the record reveals that the hypothetical questions posed by the ALJ included the limitations relevant to the employment which the ALJ found claimant could perform. The ALJ properly included the limitations in his hypothetical questions that were supported by substantial evidence. Therefore, the hypothetical questions were proper.

In sum, the court finds that the decision of the Commissioner is supported by substantial evidence and must be affirmed.

**IT IS THEREFORE ORDERED** that the decision of the Commissioner is hereby affirmed.

**IT IS SO ORDERED.**